# Lakeview Farm, Inc. and Maurice and Rita Martel v. David and Sandra Enman

[689 A.2d 1089]

No. 95-324

Present: **Allen, C.J.,\* Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed January 10, 1997

---

\*Chief Justice Allen sat at oral argument but did not participate in this decision.

*Andrew D. Mikell* and *William E. Mikell*, Burlington, for Plaintiffs-Appellees.

*Robert F. O'Neill* and *Erik B. FitzPatrick* of *Gravel and Shea*, Burlington, for Defendants-Appellants.

**Gibson, J.** Defendants David and Sandra Enman appeal a Chittenden Superior Court order that confirmed the boundary line of plaintiffs Maurice and Rita Martel's land, Lakeview Farm. The Enmans contend that (1) the evidence was insufficient to show the boundary was established by acquiescence, (2) the court erred in finding that a description in earlier deeds must refer to holdings in an adjoining town, (3) the court erred in giving effect to a second "corrective" deed in the chain of title, and (4) the court abused its discretion when it imposed sanctions for introducing a new theory of ownership during the trial. We affirm, but vacate the court's award of attorney's fees.

The Martels purchased their farm in St. George in 1955, on which they currently run a herd of dairy cattle, grow crops, and harvest timber. David and Sandra Enman purchased adjoining land to the west in 1985. Soon after the Enmans' purchase, a dispute arose between the families when the Enmans attempted to enter property claimed by the Martels and use the logging roads. After the second entry, Maurice Martel bulldozed an earthen berm across a trail to prevent future encroachment.

In 1989, the Town of St. George conducted a town-wide property reappraisal. The tax map prepared during the reappraisal showed a portion of land claimed by the Martels (hereinafter referred to as the disputed parcel) as belonging to the Enmans. The Martels appealed the assessment to the town listers and the board of civil authority, which assessed the property to the Martels in 1991. The Enmans claimed title to the parcel, however, and the Martels filed suit to seek judicial confirmation of their boundary. In December 1993, the trial court concluded that the boundary claimed by the Martels had been established by acquiescence and that the Enmans' theories of own-

ership were without merit. In addition, the court ordered the Enmans to pay the Martels $17,548.66 in attorney's fees and costs. This appeal followed.

The dispute centers primarily on conflicting evidence in the Enmans' chain of title. In 1967, Anson Peet, Jr., a predecessor in title, deeded his property to David Boardman and Raymond Pecor. The deed stated that the property contained ninety-five acres and noted the land was bounded on the east by land belonging to the Martels and Homer Murray. On September 6, 1983, Boardman and Pecor deeded the property to Champlain College, repeating the area as ninety-five acres and the eastern adjoining landowners as the Martels and Murray.

Soon after the 1983 conveyance, John Marsh surveyed the property for Champlain College. He concluded that the boundary between the college's new purchase and the Martels' farm was a meandering fenced and blazed line following, in part, a series of rock ledges and located well west of the Murray line. (See diagram.) In December 1984, Boardman and Pecor executed a "corrective deed" to Champlain College. This deed was "for the sole purpose of correcting a prior deed . . . dated September 6, 1983" and noted that the former deed "was not properly witnessed or acknowledged, and contained an inaccurate description of the property." This deed decreased the acreage to forty-eight acres. In January 1985, the Enmans purchased the land from Champlain College with a deed referring to both Boardman-Pecor deeds, but noting that "[a]lthough prior deed descriptions may have referred to the parcel of land containing 95 acres, more or less, the parcel in fact contains approximately 48 acres, more or less."

The Enmans first contend that the trial court erred when it concluded the boundary was established in the Martels' favor by acquiescence, asserting that the issue was not raised before the trial court. We disagree. Although not presented during trial, acquiescence was argued by both parties in post-trial memoranda. The Enmans themselves raised the issue in a memorandum dated February 10, 1993; the Martels responded with a memorandum two weeks later. Thus the issue was argued by both parties and presented to the court well before the court's decision of December 6, 1993. Neither party can claim lack of notice of the court's consideration of the acquiescence doctrine. See *Potwin v. Tucker*, 126 Vt. 414, 418, 234 A.2d 430, 433 (1967) (basis of court's decision adequate as long as parties have received notice, by pleading or otherwise, of issues critical to, or decisive of, litigation).

■ The Enmans contend, however, that even if the issue were properly before the court, the evidence was insufficient to conclude that the meandering line identified in the Marsh survey was established in 1949 by acquiescence. A boundary is established by acquiescence when there is "mutual recognition of a given line by the adjoining owners, and such actual continuous possession by one or both to the line" for the statutory period required to establish ownership by adverse possession. *D'Orazio v. Pashby*, 102 Vt. 480, 487, 150 A. 70, 73 (1930); see 12 V.S.A. § 501 (action for recovery of lands must be commenced within fifteen years after cause of action first accrues). Both mutual recognition and knowledge of the boundary are required. *Heath v. Dudley*, 148 Vt. 145, 148, 530 A.2d 151, 153 (1987). Once a boundary is so established, the line is conclusive upon successors in title. *O'Neil v. Buchanan*, 136 Vt. 331, 333, 388 A.2d 431, 433 (1978).

■ There was sufficient evidence for the court to conclude that the boundary was established in the Martels' favor by acquiescence. At least two generations of neighboring landowners accepted the fenced and blazed line as the boundary between the farms. Edward Boutin, who grew up on the land and whose family sold the property to the Martels in 1955, testified that his family and Anson Peet, Sr., a former owner of the Enman parcel, accepted as the common boundary the line later identified in the Marsh survey. Boutin confirmed that the disputed parcel was used by his family for pasture and timber and that they maintained the fence along the same line of rocky ledges. He further testified there was never any dispute between his family and Anson Peet, Sr. (who acquired his title in 1949) over the location of the common boundary.

After the Martels purchased the farm from the Boutins in 1955, the boundary was confirmed between the Martels and Anson Peet, Sr. when they walked the fence line separating the properties. The Martels have continued to use the land in the disputed parcel, as the Boutins did, for pasturing their cattle, harvesting timber, and cutting firewood. The Enmans do not dispute that the Martels farm the land at issue.

The earliest act that could be considered a boundary dispute came in 1965 when Anson Peet, Jr. granted Green Mountain Corporation an easement that allegedly gave it rights within the disputed area. Green Mountain Corporation strung a television cable across the disputed

land to the Murray parcel, but removed the cable in 1966 or 1967 upon the Martels' discovery and protest. Thus, mutual recognition of the common boundary, extending back at least to 1949 and continuing for the requisite fifteen years, prevails over the Enmans' recent attempts to claim ownership by pointing to discrepancies in deed descriptions.

The Enmans next contend the court erred in concluding that the description in the Boardman-Pecor and Anson Peet, Jr. deeds that the property was "bounded . . . on the east by land . . . owned by . . . Homer Murray" was an erroneous reference to a different farm. From 1912 to 1934, the Enmans' property was owned by G. Fred Peet. The trial court concluded that the description originally applied to a farm owned by Fred N. Peet in the Town of Hinesburg, south of St. George, and that this description was mistakenly inserted into the deeds for the property in St. George. The Enmans point out that such a conclusion is impossible for two reasons. First, they note that the tracts owned by Peet and Murray in Hinesburg were separated at the time by a tract known as "Lot 53," and that it would have been impossible for Murray to have been an eastern abutter to the Hinesburg Peet tract. Second, they note that Fred Peet did not acquire the Hinesburg land until 1938, long after the first reference in 1916 in the Murray's chain of title to "Fred Peet" as a western abutter.

█ We agree the trial court erred where the evidence shows the statements cannot be mistaken references to land in Hinesburg, but we find the error harmless. Errors concerning unessential findings or conclusions do not provide a basis for reversal. See *Jarvis v. Gillespie*, 155 Vt. 633, 638, 587 A.2d 981, 985 (1991). The court's conclusion that the boundary was established in the Martels' favor by acquiescence is adequate to uphold the judgment, and the court's error in no way undermines its decision under that doctrine. See *id.* at 638, 587 A.2d at 984 (court's error concerning dates was harmless where plaintiff's possession during different period was adequate to establish title by adverse possession). The court was not required to reconcile all conflicting evidence presented by the parties.

The Enmans also argue that the court erred by failing to give effect to the first Boardman-Pecor deed and accepting the second corrective deed. They claim the first deed, which transferred ninety-five acres to Champlain College, was valid and unambiguous, and therefore should be given effect, while the second deed, which corrected the acreage to forty-eight acres, was inadequate to "correct an over grant" and thereby had no legal effect.

 In fact, just the opposite is true. A deed that is improperly witnessed and acknowledged is invalid. See *Day v. Adams*, 42 Vt. 510, 515 (1869) (deed witnessed by one person where two were required was inoperative). At the time the first Boardman-Pecor deed was executed, a valid conveyance required two witnesses and an acknowledgment. See 27 V.S.A. § 341(a) (amended in 1994 to require one witness). The first Boardman-Pecor deed was witnessed by only one person, and the notary public failed to indicate who appeared before her; thus the first deed is invalid. The 1984 Boardman-Pecor "corrective" deed had two witnesses and was properly acknowledged. Therefore it was this second deed that effectively conveyed the property to Champlain College.

██ ██ In describing the land, the second Boardman-Pecor deed refers to the description in the first deed, thereby seemingly passing along the errors of the first deed, including the reference to Murray as an eastern abutter. But the second Boardman-Pecor deed is not invalid merely because it does not describe the land unambiguously. A deed with an erroneous description may still be valid when the description given, read in the light of surrounding circumstances, makes clear the land to be conveyed. *Loeb v. Al-Mor Corp.*, 615 A.2d 182, 187 (Conn. Super. Ct. 1991), *aff'd*, 615 A.2d 149 (Conn. 1992). Although the Marsh survey was not mentioned in the second deed, the deed expressly notes that the first deed "contained an inaccurate description of the property" and corrects the acreage to forty-eight acres, consistent with the results of the Marsh survey, which moved the boundary well west of the Murray tract. Thus, the evidence supports the conclusion that the intent of the second Boardman-Pecor deed was to convey the forty-eight acres located west of the Marsh survey line. See *Paradis v. Kirby*, 138 Vt. 524, 527-28, 418 A.2d 863, 865 (1980) ("[Q]uantity [of land] may be essential and controlling where other parts of the description are not sufficiently certain.").

Finally, the Enmans contend that the trial court abused its discretion when it ordered them to pay part of the Martels' attorney's fees and costs attributed to the Enmans' introduction of a new theory of ownership during trial. Based on the Enmans' failure to notify the Martels of their "canted line" theory (a method by which the lot map was adjusted or "canted" to align with town lines on the tax map), the court held that "when conduct occurs just prior to or during trial, which . . . would violate . . . discovery rules[] V.R.C.P. 26 and 37[] if it had occurred during the normal discovery period, that conduct may constitute [sanctionable behavior]." Generally, attorney's fees may be

awarded only in exceptional cases. *Gilbert v. Gilbert*, 163 Vt. 549, 561, 664 A.2d 239, 245 (1995). Such situations include a violation of V.R.C.P. 11 or when a party's actions are in bad faith, vexatious, or unreasonably obstinate. *Id.* Here, the trial court found no violation of V.R.C.P. 11. Instead, it justified the sanction, in part, by analogy to disclosure requirements of discovery rules. We decline to expand our discovery rules to allow sanctions for failure to disclose legal theories in post-discovery trial proceedings.

We also do not find evidence that the Enmans' introduction of the canted-line theory during trial rose to the level of bad faith, vexation, or unreasonably obdurate or obstinate behavior. The trial court, citing *Cameron v. Burke*, 153 Vt. 565, 572 A.2d 1361 (1990), concluded that sanctions are appropriate where a party's successive abandonment of legal theories and replacement with new theories rises to the level of bad faith. But the court did not find that the Enmans acted in bad faith when they introduced the canted-line theory after the beginning of the trial. Additionally, there is no evidence that the Martels were prejudiced by introduction of the new theory; the court continued the trial to allow the Martels to develop a response. Although the Martels may have been put to additional expense to meet the new theory, presumably the same expenses would have been required regardless of when the new theory was introduced. Thus, we agree that the trial court abused its discretion in imposing sanctions.

*The superior court's order confirming the boundary in the Martels' favor is affirmed. The award of attorney's fees to be paid to the Martels by the Enmans in the amount of $17,548.66 is vacated.*

Representation of
disputed parcel and surrounding tracts.